**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KATHRYN KEICH** | Case No. 5:19-cv-02764-JDW |
| *Plaintiff,* | |
| v. | |
| **WORLDWIDE EXPRESS HOLDINGS,** **LLC, et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

The question in this case is not whether Worldwide Express Operations LLC ("WWEO") treated Kathryn Keich unfairly. The question is whether it acted illegally. That's a crucial distinction. The law only prohibits conduct that's illegal. In an at-will employment relationship, many things that someone might describe as "unfair" are legal, and it's up to the free market to sort it out. Ms. Keich has pointed out many practices at WWEO that one might deem unfair. But she has no evidence to support any of her claims that WWEO or any of its corporate affiliates violated the law. The Court will therefore grant Defendants' summary judgment motions.

## I.    FACTS

### A.    The World Wide Express Entities

There are several Worldwide Express entities in this case. The Parties have not put in the summary judgment record their exact relationship. Defendants' reference WWEX Uni Topco Holdings LLC ("TopCo") as the ultimate parent company for the venture. Their corporate disclosure statement (ECF No. 5) explains that WWEO owns

WWEX Franchise Holdings, LLC ("WWEX"). SMB Shipping Logistics LLC is a corporate affiliate, though the parties do not explain where it fits in the corporate structure. In their summary judgment motion, Defendants assert that SMB is now known as Worldwide Express, LLC. The Court will refer to the entity as "SMB."

**B.    The Terms And Compensation Of Ms. Keich's Employment At WWEO**

Prior to 2017, Ms. Keich worked as Director of Credit and Collections for Fusion Partners, a Worldwide Express franchisee. In 2017, a Worldwide Express entity acquired Fusion. During discussion of that acquisition, WWEO's Chief Operating Officer Joel Clum promised Ms. Keich that her compensation would not go backwards if she were to continue in her position after the acquisition. Relying on that promise, Ms. Keich accepted the offer and became WWEO's Director of Credit and Collections. When Ms. Keich joined WWEO, she was awarded Class B and Class C membership units in TopCo. (*Id.*) Unlike Class A units, Ms. Keich's right to continued ownership of these units depended on her continued employment with WWEO.

WWEO maintained an employee handbook that applied to Ms. Keich. The 2018 Employee Handbook required that employees raise ethical concerns with WWEO's senior management. The Handbook included a Whistleblower Policy that provided, "If an employee becomes aware of an actual or perceived illegal, dishonest, or fraudulent activity, the employee must contact the Vice President of Human Resources or General Counsel and report the concern in writing." (ECF No. 45-4 at 5.) The Policy also stated that WWEO "will neither retaliate against a whistleblower nor tolerate such retaliation by employees or supervisors. . . ." (*Id.*) And it included an Antiretaliation Policy that says that the "Company does not tolerate retaliation against employees

2

who in good faith raise concerns or questions regarding a potential violation of the Company's standards of conduct . . . (*Id*.)

At Fusion, Ms. Keich reported to Steven Backlund. Ms. Keich continued to report to him at WWEO until he resigned in the Summer of 2017. Ms. Keich grew concerned about Mr. Baklund's resignation and her growing responsibilities. She had a conversation with WWEO's then-Chief Financial Officer Robert Rose. Mr. Rose told Ms. Keich that TopCo had agreed to award her Class B membership units. Although Ms. Keich followed up in an email, she never received Class B membership units in TopCo. She was also never offered an opportunity to buy Class A shares. But in 2018, Ms. Keich learned that male Directors of Sales had the opportunity to purchase Class A membership units in TopCo. She later learned that WWEO paid them more than her, too.

Ms. Keich was responsible for collections for WWEO and some of its affiliates, including SMB. Ms. Keich was also responsible for making recommendations regarding WWEO and its affiliates' bad debt allowance. She supervised employees, hosted meetings to "educate sales personnel about collections issues," and attended Director of Sales' meetings. (ECF No. 45-2 at ¶ 17.) In contrast to Ms. Keich's position, WWEO's Directors of Sales led the organization's sales force and ensured that sales objectives were met. Mr. Baklund, testified that Ms. Keich's position "required substantially equal skill" to that of Director of Sales. (ECF No. 45-15 at 3.) "Both positions required the same type of experience in understanding customers, and both positions required excellent communication skills in dealing with those customers." (*Id*.)

### C.  Ms. Keich's Concerns Over WWEO's Bad Debt

In late 2017, Ms. Keich grew concerned that WWEO and its affiliates "were artificially inflating their accounts receivable and (thus artificially decreasing their bad debts.)" (ECF No. 45-2 at ¶ 18.) Ms. Keich reported her concerns to her supervisor Kathy Tiritilli. But, for the most part, Ms. Tiritilli ignored them. By the Fall of 2017, Ms. Kiech believed that the way WWEO allocated its debt raised "serious ethical concerns." (*Id*. at ¶ 25.) After raising her concerns with Ms. Tiritilli, Ms. Keich escalated them via email to Mr. Rose. Mr. Rose remanded the discussion back to Ms. Tiritilli, who talked to Ms. Keich about her job status at WWEO. Ms. Keich found Ms. Tiritilli unresponsive to her concerns, so she decided to present her concerns directly to the company's management.

### D.  The End Of Ms. Keich's Employment

On January 31, 2019, Ms. Keich sent an email titled "Time to part ways" to WWEO's CEO and General Counsel (the "January 31 Email"). (ECF No. 34-1 at Ex. 31.) In the email, Ms. Keich outlined her concerns about company's handling of the bad debt allowance, as well as her complaints that she was inadequately compensated. Specifically, Ms. Keich inquired "what formula or parameters were used to determine who Worldwide Express/SMB offered equity buy in opportunity . . .." (*Id.*) She also wrote that she "wasn't offered this equity buy in opportunity," noting that "hopefully [she] was the only one overlooked." (*Id*.) Ms. Keich also inquired how WWEO determined market value for salaries and whether WWEO used "market value for evaluating all director positions." (*Id*.) In closing, Ms. Keich asked to negotiation a separation package while she remained in her position. A few days later, Mr. Rose

4

emailed Ms. Keich asking her not to return to work on the following day and noting that "it is highly unusual. . . for an employee to resign and then ask for severance package. . .." (*Id*. at Ex. 34.)

### E.    Procedural History

Ms. Keich filed this action on June 25, 2019. In an Amended Complaint, she asserts claims under the Equal Pay Act, Title VII, and the Pennsylvania Human Relations Act on the basis on gender-based discrimination. She also asserts a common law breach of contract claim and a claim based on Pennsylvania Wage Payment and Collection Law.  She asserts all of these claims against WWEO. In addition to her claims against WWEO, Ms. Keich asserts five claims against WWEO's affiliates, WWEX, SMB, and TopCo: (1) breach of contract against WWEX and SMB; (2) violation of EPA against WWEX; (3) violation of Title VII against WWEX; (4) violation of PHRA against WWEX; and (5) violation of WPCL against WWEX. WWEO filed a motion for summary judgment, arguing that Ms. Keich does not have evidence to support any of her claims. In addition, WWEX, SMB, and TopCo filed a separate motion arguing that they cannot be liable to Ms. Keich because they did not employ her. Both motions are ripe for decision.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the nonmoving party fails to make such a showing. *See Celotex*, 477 U.S. at 323.

## III.  ANALYSIS

### A.    EPA Claim

Claims under the EPA follow a two-step burden-shifting paradigm. *See Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000). The plaintiff must first establish a *prima facie* case by showing that an employer paid different wages to employees of the opposite sex for performing "equal work. . . ." *Id*. If the plaintiff establishes the *prima facie* case, "[t]he burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses" that the EPA specifies. *Id*. (emphasis in original).

Under the EPA, "equal work" is "work of substantially equal skill, effort and responsibility, under similar working conditions." *Id*. at 107 (citing *E.E.O.C. v. State of Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1413-14 (3d Cir. 1989)). The terms

skill, effort, and responsibility "constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14. "The crucial finding. . . is whether the jobs to be compared have a 'common core' of tasks, *i.e.,* whether a significant portion of the two jobs is identical." *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985). "The inquiry then turns to whether the differing or additional tasks make the work substantially different." *Id.*

Ms. Keich contends that in her position as Director of Credit and Collections she performed "equal work" to the Director of Sales. To support this conclusion, Ms. Keich relies on the Declaration of Steven Baklund, her former supervisor, who testified that the jobs of Director of Credit and Collections and Director of Sales require "substantially equal skills" and shared "a common core of skills." But equal skill alone is not enough to establish a prima facie EPA claim. There must also be enough overlap between the two positions to make them equal.

Ms. Keich does not present any evidence to show that the two positions—Director of Credit and Collections and Director of Sales—shared overlapping responsibilities. To the contrary, the record establishes that Directors of Sales were responsible for generating new business and attracting new customers while Ms. Keich, in her role as Director of Credit and Collections, was not. Although Ms. Keich suggests that both the Director of Credit and Collections and the Directors of Sales were responsible for supervising employees and communicating with customers, that argument is not enough. Many management-level employees supervise employees, but not all management-level employees are comparable under the EPA. Ms. Keich fails to show that supervising employees in debt collection is akin to supervising a

7

sales force. Many employees talk to customers, too, but that does not make them comparable. Instead, Ms. Keich would have to show that she was responsible for the same type of communications as the Directors of Sales, and she has not. She communicated about collections, and Directors of Sales communicated about sales. The two are not the same. Ms. Keich fails to carry her burden of showing that she and her comparators performed equal work.

**B.      Title VII and PHRA Claims**

The Court analyzes Ms. Keich's Title VII and PHRA claims coextensively. *See Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). The three-step *McDonnell Douglas* burden-shifting framework applies to those claims. *See Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F. Supp.2d 383, 388 (E.D. Pa. 2007). Under this framework, the plaintiff must first establish a *prima facia* case of discrimination or retaliation. *Id*. at 388, 390. If the plaintiff carries this initial burden, the burden shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its action. *Id*. at 388.(citing *McDonnell Douglas*, 411 U.S. 792, 802-804 (1973)).  If the employer articulates such a reason, the burden shifts back to the plaintiff to show by competent evidence that the articulated reason is pretextual. *Id*.

**1.      Discrimination**

To state a *prima facie* case of discrimination, a plaintiff must show (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Defendants do not dispute that Ms. Keich is a member of

a protected class and was qualified for her position. They dispute the latter two elements, though.

Ms. Keich has offered evidence that she was paid less than male colleagues in other departments. That lower pay could be an adverse employment action. But as discussed above, she has not shown that those colleagues performed equal work. Without evidence that the work was equal, or some other evidence of discrimination, Ms. Keich cannot establish that the action occurred under circumstances giving rise to an inference of discrimination. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3d Cir. 1996).

### 2.    Retaliation

A *prima facie* retaliation claim requires a plaintiff to demonstrate that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action. *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995) (citing another source). Protected activity includes informal complaints to management about discriminatory employment practices. *See Curay-Cramer v. Ursuline Acad. Of Wilmington Del., Inc.*, 450 F. 3d 130, 135 (3d Cir. 2006). While the message need not expressly use the term discrimination, "it must be possible to discern from the context of the statement that the employee opposes an unlawful practice." *Id*. (citing another source). "[A] general complaint of unfair treatment that cannot be reasonably construed as relating to alleged discrimination is not enough." *Id.*

WWEO argues that Ms. Keich failed to identify any protected activity to make out a *prima facie* retaliation claim. Ms. Keich did not respond to WWEO's arguments

on this issue. And the Court cannot find any protected activity on the record. To the extent that Ms. Keich relies on it, the January 31 Email is not protected activity.  In her email, Ms. Keich complained about disparity in compensation and  inquired how WWEO arrived at its compensation structure. But Ms. Keich neither suggested that this disparity resulted from discrimination nor claimed that men made more money than she did. Based on these facts, a reasonable factfinder could not conclude that Mr. Keich was accusing WWEO of discrimination.

### C.    State Law Claims

#### 1.    Pennsylvania Wage Payment and Collection Law

The WPCL "does not create a right to compensation." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003), *as amended* (Nov. 14, 2003) (citations omitted). Instead it "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." *Id*. "[T]he contract between the parties governs in determining whether specific wages are earned." *Id*. Thus, a "prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid." *Giuliani v. Polysciences, Inc.*, 275 F. Supp.3d 564, 577 (E.D. Pa. 2017) (citation and punctuation omitted).

"Where an employee does not work under a written employment contract or collective bargaining agreement, the employee will have to establish the formation of an implied oral contract to recover under the WPCL." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp.3d 645, 649 (E.D. Pa. 2015) (citing *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301 (3d Cir. 2003)). Under Pennsylvania law, to establish an enforceable contract, plaintiff must show (1) a mutual intention to be bound by an

agreement, (2) terms that are sufficiently definite to be enforceable, and (3) consideration. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 533 (3d Cir. 2009). Terms are sufficiently definite where a "reasonably certain basis exists upon which a court could grant an appropriate remedy." *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. 1992); *see also Sloan v. Frascella*, No. CIV.A. 12-3609, 2013 WL 4433366, at *3 (E.D. Pa. Aug. 16, 2013) ("In oral agreements, vague statements that fail to include material terms, are indicia that agreements are too uncertain to be enforced.").

Neither Mr. Clum's promise about Ms. Keich's compensation nor Mr. Rose's promise about additional Class B membership units is  sufficiently definite to form an enforceable contract. Mr. Clum's statement that Ms. Keich's compensation "would not go backwards" lacks specificity. For example, Mr. Clum did not discuss an exact amount of compensation or how Ms. Keich would be compensated (*e.g.*, bonuses or base pay).  Similarly, Mr. Rose's promise to award Ms. Keich Class B shares is too indefinite to be enforced. Mr. Rose and Ms. Keich did not, for example, agree to a number of shares or when Class B shares would be awarded. Given the lack of specificity around the two promises, the Court concludes Ms. Keich did not establish a contractual obligation necessary for her WPCL claim.

Lastly, in the Amended Complaint, Ms. Keich alleges that WWEO failed to pay out PTO compensation owed to her at the time her employment ended. But Ms. Keich does not identify a contract or a term that entitles her to payment for the PTO.  Nor does the Court see such a contract or agreement on the record. Moreover, Ms. Keich did not respond to WWEO's argument that her PTO was converted to unlimited PTO,

which made it ineligible for payment. As a result, Ms. Keich failed to establish that WWEO breached a contractual obligation to pay her earned wages.

### 2.    Breach of contract

Ms. Keich also claims that WWEO breached the Whistleblower and Anti-Relation Policies in the 2018 Handbook when it fired her. Pennsylvania presumes employment to be at will, meaning that either an employer or employee may terminate employment at any time, for any or no reason. *Hardee-Guerra v. Shire Pharm.,* 737 F. Supp.2d 318, 325 (E.D. Pa. 2010) (quoting *Scully v. U.S. Wats, Inc.*, 238 F. 3d 497, 505 (4d Cir. 2001). To rebut this presumption, a plaintiff "must establish one of the following: (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception." *Janis v. AMP, Inc.*, 856 A.2d 140, 144–45 (Pa. Super.2004) (cleaned up). Ms. Keich fails to establish any of these four exceptions.

The Handbook is neither an agreement for a definite duration nor one that suggests Ms. Keich can only be fired for just cause.  In fact, on the same page as the Whistleblower Policy, the Handbook states that it "does not create contractual obligations" and "nothing in this Handbook alters or modifies the at-will nature of employment." (ECF No. 45-4 at 5.) In such cases, courts decline to find the existence of a contract. *See, e.g.*, *Landmesser v. United Air Lines, Inc.*, 102 F. Supp.2d 273, 280 (E.D. Pa. 2000) ("[Hanbook's] explicit disclaimer of the formation of a contract nullifies plaintiff's claim for breach of contract."); *LaVeglia v. TD Bank, N.A.*, No. 2:19-CV-01917-JDW, 2020 WL 2512802 (E.D. Pa. May 15, 2020) (employer's Parental Leave Policy did

not alter the default rule of employment-at-will.). In addition, nothing on the record suggests an exchange of additional consideration that would defeat the at-will presumption.

Ms. Keich argues that WWEO's Whistleblower and Anti-Retaliation Policies created a unilateral contract, so no additional consideration was required. Pennsylvania courts recognize that provisions in a handbook, which offer additional terms of employment, can "constitute a unilateral offer. . . which the employee accepts by the continuing performance of his or her duties." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 941 (Pa. Super. 2011), *aff'd,* 630 Pa. 292, 106 A.3d 656 (2014) (citing *Caucci v. Prison Health Servs., Inc.*, 153 F. Supp.2d 605, 611 (E.D. Pa. 2001)). In such cases, the provisions that comprise the unilateral contract are for incidental employment benefits, such as overtime pay or vacation time, and do not alter employees' at-will employment status. *See id*. In *Caucci*, for example, the court held that a provision in an employee handbook for overtime wages could constitute a unilateral contract. *Caucci*, 153 F. Supp.2d at 611-12; *see also Cathcart v. Micale*, 402 F. Supp.3d 110, 114 (E.D. Pa. 2019), *reconsideration denied,* No. 2:19-CV-01852-JDW, 2019 WL 4466995 (E.D. Pa. Sept. 18, 2019) (employer's promise not to retaliate against an employee was not incidental or collateral to that employee's at-will employment status); *Knapp v. Susquehanna Vill. Facility Operations, LLC*, No. 3:18-CV-1941, 2019 WL 4671108 (M.D. Pa. Sept. 24, 2019) (employee handbook provision for sick leave and vacation time could constitute a unilateral contract).

WWEO's Whistleblower and Anti-Retaliation Policies are not incidental or collateral to Ms. Keich's at-will employment status. Ms. Keich alleges that her

termination breached the Handbook. Thus, contrary to Ms. Keich's assertions, WWEO's policies were not "incidental" to her at-will employment because, if they were binding, they would have altered the at-will nature of her employment.

### D.      Claims Against WWEX, SMB, And TopCo

Ms. Keich advances two theories of liability in support of her claims against WWEX, SMB, and TopCo: (1) general agency principals and (2) joint employer theory. She lacks evidence to support either theory. A joint employment relationship exists when "two entities exercise significant control over the same employee." *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997) (citing *N.L.R.B. v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982). District courts in this Circuit have distilled joint employer analysis to three factors: "(1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) day-to-day supervision of employees, including employee discipline; and (3) control of employee records, including payroll, insurance, taxes and the like." *Myers. Garfield & Johnson Ent.,* 679 F. Supp.2d 598, 607 (E.D.Pa. 2010). !

None of these entities employed Ms. Keich because none of them controlled the terms of her employment, such as the payroll system, HR, or IT matters. It does not matter that Ms. Keich collected debt for other entities within the corporate family or that, more generally, corporate affiliates benefitted from her work. WWEO was free to have her do work that benefitted affiliates without converting her into an employee of those companies. Nor does it matter that the Handbook defined "Company" as

"SMB." Even though the Handbook discussed matters like compensation and HR, it did not give SMB control over those functions for Ms. Keich's employment.

Ms. Keich also fails to establish that TopCo employed her because there is no evidence that Mr. Rose acted as TopCo's agent. The doctrine of apparent authority applies to employment contracts as it would in any other contract. *See id.* at 614. To recover under this theory, a plaintiff must demonstrate that her employer acted as the agent of another entity. *Id*. Ms. Keich may believe that Mr. Rose's promise was a binding contract *for* TopCo's units (*i.e.*, Mr. Rose and/or WWEO owes Ms. Keich TopCo shares), but it does not bind TopCo.

## IV.    CONCLUSION

The Court doesn't know, and doesn't have to decide, whether any Defendant treated Ms. Keich unfairly. They might have. But she does not have evidence that they broke the law during her employment or when they terminated her. So the Court will grant the summary judgment motions. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

October 23, 2020